UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** </br></br> v. </br></br> **GERARDO GONZALEZ-VALENCIA,** </br>       also known as "Lalo," "Flaco," </br>       "Silver," "Silverio," "Eduardo," </br>       and "Laline," </br></br>              **Defendant.** | **CRIMINAL NO. 16-065 (BAH)** |

### GOVERNMENT'S REPLY IN SUPPORT OF
### SUPPLEMENTAL SENTENCING MEMORANDUM

The United States respectfully submits this reply to Defendant Gerardo Gonzalez-Valencia's (hereafter the "Defendant's") Post-Hearing Response Brief in Aid of Sentencing. Dkt. No. 179. For the reasons set forth below, and in the Government's Supplemental Sentencing Memorandum, Dkt. No. 170, the Court should impose the Guideline sentence of life imprisonment to reflect the nature, circumstances, and seriousness of the Defendant's unlawful conduct.

**I.    Criminal History**

The Defendant disagrees with the Probation Office and the Government and argues that he should not be a Criminal History Category III because it misrepresents his criminal history. It does not. A Criminal History Category of III applies to the Defendant and does not "substantially over-represent[] the seriousness of the defendant's criminal history[.]" U.S.S.G. § 4A1.3(b). Following his 1998 conviction for use of a communication facility to facilitate a methamphetamine-trafficking offense, the Defendant was given the opportunity to serve a portion of his sentence in a halfway house designed to provide structure and resources to help

1

prisoners prepare for reentry into the community.  *See* 18 U.S.C. § 3624(c).  The Defendant abused that trust by lying to the halfway house that he was leaving to seek employment, fleeing to Mexico, and shortly thereafter returning to drug trafficking on a much larger scale.  This was not a minor lapse in judgment, but instead a deliberate abuse of the system in order to re-offend.  A Criminal History Category of III is an accurate calculation, appropriately reflects the seriousness of his prior criminal conduct, and no departure from that calculation is warranted.

## II. **Enhancements**

The Government has proven by a preponderance of the evidence that the applicable drug quantity is 450 kilograms or more and that enhancements for leadership, violence, and use of a dangerous weapon apply.[1]  The Defendant's challenges to the credibility of the Government's witnesses and the sufficiency of the evidence are not supported by the record or the applicable caselaw.  The sentencing enhancements sought by the Government are well supported in the record, and Defendant's argument that these sentencing enhancements do not apply to him are without merit.

### A. Witness Credibility

The Defendant spends much of his Post-Hearing Brief arguing that the witnesses' disclosure or non-disclosure of information at certain times undermines their credibility.  To the contrary, as multiple witnesses testified, the topic of conversation in proffers with the Government is decided by the agents and prosecutors, not the witness.  Tr. 5/3/23 at 47, 165–66; Hr'g Tr. 5/4/23 at 7.  In a long-running investigation, such as the investigation of Los Cuinis and the Cartel de Jalisco Nueva Generacion (CJNG), new targets naturally become the focus over

---

[1] The parties do not dispute the application of a two-point enhancement for use of a semi-submersible to import a controlled substance pursuant to U.S.S.G. § 2D1.1(b)(3)(B).

time. Hr'g Tr. 5/4/23 at 7. The inclusion or omission of information in the proffer notes is, in large part, a result of the topics chosen and questions asked by the Government on a particular date. Moreover, the notes are not intended to be a verbatim transcript of what the witness said during the proffer. *Id.*

The Defendant also urges the Court to discredit *all* testimony of the Government's cooperating witnesses. However, the Defendant has not established that any portion of the cooperator testimony should be discarded, let alone all of it. Moreover, the witnesses corroborate each other on key events, several of which are documented in news articles and intercepted BlackBerry Messenger (BBM) communications, demonstrating the reliability of the testimony.

Oscar Nava Valencia's testimony should not be discarded because he briefly attempted to recant a prior statement out of fear of testifying in the Genaro Garcia Luna trial. Nava Valencia and his family had been threatened, and members of his family disappeared, as a result of his cooperation. Hr'g Tr. 5/3/23 at 50. Nava Valencia was placed in protective housing while in U.S. custody and was placed in isolation for eight months solely for his own protection. *Id.* at 50–51. Nava Valencia's hesitancy to testify in a high-profile trial with substantial media attention after receiving threats, losing family members, and being placed in protective custody is understandable. Despite his fear, Nava Valencia testified in the Garcia Luna trial consistent with his prior proffered statements and the Defendant's sentencing at great risk to himself and his family.

Nor should Nava Valencia's testimony be discarded because he ordered acts of violence. Not only has Nava Valencia admitted to, and taken responsibility for, acts of violence, but at least one act of violence that he ordered—the killing of Antonio Guizar Valencia—was at the

3

request of the Defendant and his brothers. Thus, the violence ordered by Nava Valencia is particularly relevant and does not undermine Nava Valencia's credibility.

Jose Maria Guizar Valencia's entire testimony is not discredited simply because the Government did not show him a photo of the Defendant prior to the evidentiary hearing. Whether Guizar Valencia was shown a photo of the Defendant prior to the hearing has no bearing on whether he could identify the Defendant in court or elsewhere. In fact, Guizar Valencia confidently identified the Defendant in the courtroom, and, when asked if he wanted the Defendant to remove his facemask for purposes of identification, Guizar Valencia responded, "No. I can identify him very well. I know him well." *Id.* at 57–58.

Finally, Elpidio Mojarro Ramirez's testimony is not discredited due to a prior misidentification of an old photograph of the Defendant. At the evidentiary hearing, Mojarro Ramirez identified the Defendant as the person he knew as "Lalo or Flaco," who was a member of Los Cuinis. *Id.* at 132–33. Mojarro Ramirez stated that no other Gonzalez-Valencia sibling went by the nickname "Lalo," and he proceeded to discuss in-person meetings and drug transactions in which they both participated. *Id.* at 134; *see also* Hr'g Tr. 5/4/23 at 128 (Investigator Joseph Smith testifying that he was not aware of a "Lalo" in the Defendant's family other than the Defendant). Accordingly, there is no legitimate basis for discarding any witness's testimony in its entirety.

### B. Drug Quantity

The Government has proven by a preponderance of the evidence that the Defendant is responsible for more than 450 kilograms of cocaine as part of the conspiracy to which he has pleaded guilty. The Government has presented evidence of numerous cocaine transactions in which the Defendant participated, including cocaine shipments destined for the United States.

Those shipments collectively totaled at least tens of thousands of kilograms of cocaine, as detailed in the Government's Supplemental Sentencing Memorandum, Dkt. No. 170, and Motion for Preliminary Order of Forfeiture, Dkt. No. 172.

The Defendant's attempt to distance himself from these transactions by claiming that the witnesses previously identified "Los Cuinis" as participants, and not the Defendant personally, is misleading as a matter of both fact and law.  Nava Valencia and Mojarro Ramirez both testified that when they used the term "Los Cuinis," they were referring to the Defendant and his brothers Abigael and Jose.  Hr'g Tr. 5/2/23 at 29–30, 39; Hr'g Tr. 5/3/23 at 145.  Further, Nava Valencia, Mojarro Ramirez, and Guizar Valencia all testified about drug transactions exceeding 450 kilograms in which the Defendant personally participated.

Additionally, the Government need not prove that the Defendant's personal contributions to the cocaine shipments exceeded 450 kilograms of cocaine.  A defendant's base offense level is determined by "relevant conduct."  U.S.S.G. § 1B1.3.  In a drug conspiracy case, "relevant conduct" includes not only "all acts . . . committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," but also "all reasonably foreseeable acts . . . of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G. § 1B1.3(a)(1); *see also United States v. Booze*, 108 F.3d 378, 381 (D.C. Cir. 1997).  This standard is based on the "well-settled principle of conspiracy law that someone who jointly undertakes a criminal activity with others is accountable for their reasonably foreseeable conduct in furtherance of the joint undertaking."  *United States v. Saro*, 24 F.3d 283,

288 (D.C. Cir. 1994). The amount of cocaine that the charged conspiracy distributed for importation into the United States greatly exceeded 450 kilograms of cocaine, and that quantity was reasonably foreseeable to the Defendant.

Although the Government presented evidence of numerous cocaine shipments in which the Defendant participated, the Court need only look to the cocaine shipment on the semi-submersible seized by the U.S. Coast Guard in 2007 to find that the amount of cocaine the Defendant conspired to distribute exceeded 450 kilograms. The Defendant admits to being an investor in the seized semi-submersible shipment and that he knew and intended that the cocaine on board the semi-submersible ultimately would be imported into the United States. Dkt. No. 139 ¶ 3. Nava Valencia testified that the semi-submersible was carrying approximately 5,000 kilograms of cocaine. Hr'g Tr. 5/2/23 at 39. Nava Valencia also explained that the minimum amount of cocaine that the Milenio Cartel and its partners would send via semi-submersible was 3,000 kilograms, given the substantial time and expense of building a semi-submersible, which would only be used once, as well as the slower speed at which the semi-submersible transported the cocaine from Colombia to Mexico compared to other transportation methods. *Id.* at 38–39. In other words, it would not make sense as a matter of business to use a semi-submersible to transport only 280 kilograms of cocaine, the amount the U.S. Coast Guard recovered from the water after the semi-submersible crew scuttled the vessel. Additionally, Special Agent Kevin Novick, who has personally participated in the interdiction of a semi-submersible while a member of the U.S. Coast Guard, testified that a semi-submersible like the one interdicted in this case could hold more than two metric tons. Hr'g Tr. 5/2/23 at 11–12. Thus, by all accounts, the quantity of cocaine on the semi-submersible exceeded 450 kilograms.

Finally, the Government did not err in charging the Defendant with conspiring to distribute five kilograms or more of cocaine, rather than 450 kilograms or more of cocaine. Any fact that increases the mandatory minimum must be specifically alleged, *Alleyne v. United States*, 570 U.S. 99, 103 (2013); however, there is no such requirement for drug quantities that trigger higher Sentencing Guidelines calculations. Here, 21 U.S.C. § 960(b)(1)(B)(ii) sets a threshold of "5 kilograms or more of a mixture or substance containing a detectable amount of cocaine . . . ." for the application of a mandatory minimum "term of imprisonment of not less than 10 years." The quantity charged in the Indictment reflects the quantity needed to trigger the ten-year mandatory minimum. *See* Dkt. No. 1. Thus, the drug quantity in the Indictment correctly reflects the quantity in Section 960(b)(1)(B)(ii), rather than a quantity in the U.S. Sentencing Guidelines, and does not impose any cap on the amount of cocaine for which the Defendant may be held responsible.

### C. Violence

The Government has proven by a preponderance of the evidence that the violence enhancement applies pursuant to U.S.S.G. § 2D1.1(b)(2). The evidence to support the enhancement is not "unreliable hearsay," as the Defendant contends, Dkt. No. 179 at 23, but rather testimony of individuals with firsthand knowledge. Further, the fact that the Defendant asked, directed, and paid others to put their lives at risk and commit acts of violence on his behalf does not make the Defendant any less culpable for that violence. Even if the evidence was hearsay, it was not unreliable because it was corroborated by percipient witnesses, and hearsay is admissible for purposes of sentencing.

The evidence of the Defendant's involvement in the murder of Antonio Guizar Valencia is corroborated by all three cooperating witnesses, who have personal knowledge of the

Defendant's participation. Nava Valencia and Mojarro Ramirez both testified that the Defendant and his brothers Abigael and Jose, collectively referred to as "Los Cuinis," asked Nava Valencia at an in-person meeting for gunmen to find Antonio Guizar Valencia and make him "pay" for stealing a shipment of cocaine belonging to Los Cuinis. Hr'g Tr. 5/2/23 at 51–52; Hr'g Tr. 5/3/23 at 19. Nava Valencia sent his gunmen to find Antonio Guizar Valencia at the request of Los Cuinis, and they killed Antonio Guizar Valencia and several others. Hr'g Tr. 5/2/23 at 52; Hr'g Tr. 5/3/23 at 68–69. The Defendant's attempt to create doubt about which brother made the request of Nava Valencia is futile, as all three brothers came to Nava Valencia jointly to make the request to have Antonio Guizar Valencia killed. Further confirming the Defendant's involvement in the murder, Jose Maria Guizar Valencia testified that he heard the Defendant claim responsibility for the murder and demand $12 million from the Guizar Valencia family for the cocaine that the Defendant believed Antonio Guizar Valencia stole in a phone call. Hr'g Tr. 5/3/23 at 69, 95. The notion that all three witnesses—including one from a rival drug trafficking organization—were fabricating the Defendant's involvement in the murder of Antonio Guizar Valencia under oath strains credulity.

Regarding the murder of Efrain Teodoro Torres, also known as "Chispa" and "Zeta 14," Guizar Valencia personally witnessed the killing at a racetrack and heard an individual on the assassin's cell phone self-identify as "La Barbie."[2] Hr'g Tr. 5/3/23 at 71–74. Separately, Nava

---

[2] The Government did not "withhold" *Brady* material, as the Defendant alleges. The testimony of Jose Carlos Hinojosa at issue is publicly available, and "there cannot be a *Brady* violation for failure to disclose public documents which the Defendants could have found on their own." *United States v. Borda*, 941 F. Supp. 2d 16, 25 (D.D.C. 2013). Upon learning of Hinojosa's testimony in the Western District of Texas, the trial team attempted to locate notes about Hinojosa's basis of knowledge, asked an agent to interview Hinojosa about his basis of knowledge, and provided the agent's summary of the interview to the defense. *See* Def. Ex. 57. Moreover, the Defendant had transcripts of Hinojosa's testimony and was able to make use of them at sentencing and thus suffered no prejudice.

Valencia testified that he discussed the shooting with La Barbie in person, and La Barbie confirmed that the Defendant ordered the murder, La Barbie had been present with the Defendant in Mexico City at the time of the murder, and the Defendant asked La Barbie to contribute money to pay the gunmen. Hr'g Tr. 5/2/23 at 56–58. Guizar Valencia testified that the top leadership of Los Zetas was aware that the Defendant and Los Cuinis ordered the murder. Hr'g Tr. 5/3/23 at 79. The Defendant's attempt to place blame for the murder on Zetas member Miguel Angel Trevino Morales or Nava Valencia using unsubstantiated hearsay from Jose Carlos Hinojosa does not undermine the testimony of Nava Valencia and Guizar Valencia about the Defendant's involvement. Hinojosa himself describes the information about Nava Valencia's involvement as merely "rumors," and Hinojosa concedes having no personal basis of knowledge as to Trevino Morales' supposed involvement. *See* Def. Ex. 57.

Regarding the murder of Domingo Mendoza Sandoval, also known as "Mingo," Mojarro Ramirez learned that the Defendant ordered the murder of Mendoza Sandoval from the victim himself while he was on the run and pleading for help in 2011. Hr'g Tr. 5/3/23 at 147–48. As Mendoza Sandoval explained to Mojarro Ramirez, the Defendant told Mendoza Sandoval that he would send his brother-in-law Nemesio Oseguera Cervantes, also known as Mencho, to see Mendoza Sandoval after the Defendant and Mendoza Sandoval got into an accounting dispute. *Id.* at 148. Mendoza Sandoval told Mojarro Ramirez that Oseguera Cervantes arrived at Mendoza Sandoval's ranch while Mendoza Sandoval was present and killed Mendoza Sandoval's brother and three workers; however, Mendoza Sandoval managed to get away. *Id.* at 148–49. Mojarro Ramirez has been consistent in his account of what transpired. Additionally, Mojarro Ramirez's information is corroborated by BBM communications in which Oseguera

9

Cervantes and Los Cuinis were still actively looking for Mendoza Sandoval in 2013 in order to kill him. *See* Dkt. No. 170 at 11–12 (collecting examples).

Finally, Nava Valencia testified that he learned from the Defendant that the Defendant had ordered the murder of a family in Michoacan. Hr'g Tr. 5/2/23 at 61. Nava Valencia testified with no ambiguity that, "It was Lalo[,] Directly Lalo," who ordered the murder. *Id.* at 60.

### D. Dangerous Weapons

The Defendant regularly carried a pistol during meetings to negotiate and receive cocaine shipments and caused others to carry firearms in furtherance of the cocaine conspiracy, warranting a two-point enhancement for possession of a dangerous weapon pursuant to U.S.S.G. § 2D1.1(b)(1).

Carrying a firearm to meetings to discuss or conduct drug transactions is sufficient to warrant the application of U.S.S.G. § 2D1.1(b)(1). *See United States v. Leyva,* 916 F.3d 14, 26–27 (D.C. Cir. 2019) (affirming two-point weapons enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) where government presented evidence that defendant carried pistol "as he conducted drug trafficking business" and defendant had pistol at time of arrest); *United States v. Vega*, 826 F.3d 514, 543 (D.C. Cir. 2016) (affirming two-point weapons enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) where defendant carried firearm while running cocaine lab and carried handgun while committing drug offenses); *United States v. Gonzalez-Vazquez*, 34 F.3d 19, 24 (1st Cir. 1994) (affirming two-point weapons enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) where defendant carried pistol "while one of his coconspirators negotiated the terms of a proposed narcotics transaction.")

Here, Nava Valencia testified that the Defendant carried a .38 super or a 9mm pistol to meetings to conduct drug trafficking, Hr'g Tr. 5/2/23 at 54, and Guizar Valencia testified that the

Defendant was always armed with a .38 super pistol in meetings to receive cocaine from Guizar Valencia, Hr'g Tr. 5/3/23 at 66.  Further, Nava Valencia testified that the Defendant would sometimes bring armed bodyguards to meetings to discuss drug trafficking, Hr'g Tr. 5/2/23 at 54, and Guizar Valencia testified that Defendant's workers had AK-47 rifles in their vehicles when the Defendant met with Guizar Valencia to receive cocaine, Hr'g Tr. 5/3/23 at 66.  Such conduct is sufficient to warrant the two-point weapons enhancement.

The Defendant's reliance on *United States v. Bagcho*, 923 F.3d 1131 (D.C. Cir. 2019), to argue otherwise is misplaced.  Dkt. No. 179 at 33–34.  In *Bagcho*, the D.C. Circuit addressed the defendant's alleged "constructive possession" of a firearm found during a raid of his compound.  *Bagcho*, 923 F.3d at 1139–40.  The D.C. Circuit found the record insufficient to apply the weapons enhancement because the government "provided no evidence linking the weapon to [the defendant being sentenced] beyond the fact that it was found at the compound he owned," the defendant was not present on the compound at the time of the raid, and "many people either lived or worked in the compound."  *Id*.  In contrast, both Nava Valencia and Guizar Valencia saw the Defendant personally carrying a pistol at meetings to discuss and/or conduct drug transactions and saw workers the Defendant directed acting as armed bodyguards for him.

Finally, the Defendant attempts to sow confusion about witness testimony regarding firearms where there is none.  Nava Valencia did not say that the Defendant "only armed himself after the rooster fight incident in 2007," as the Defendant contends.  Dkt. No. 179 at 32.  Rather, Nava Valencia stated that the Defendant "started caring *more* about security and hiring *more* people," including armed gunmen, after the 2007 rooster fight incident.  Hr'g Tr. 5/2/23 at 53–54 (emphasis added).  Nava Valencia's testimony indicates that the Defendant had some armed

security prior to the rooster fight incident. Moreover, Nava Valencia's testimony does not contradict Guizar Valencia's testimony that the Defendant carried a pistol prior to 2007.

### E. Leadership

The Defendant contests any leadership enhancement. However, the Government has proven by a preponderance of the evidence that the Defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," warranting a four-point enhancement pursuant to U.S.S.G. § 3B1.1(a).

The Defendant's portrayal of himself as a modest investor in some cocaine shipments who may have occasionally performed "low-level functionary duties" is completely contradicted by the evidence. *See* Dkt. No. 179 at 34–36. Nava Valencia, Guizar Valencia, and Mojarro Ramirez all testified that the Defendant was a leader, if not the primary leader, of the Los Cuinis DTO, which was allied with such powerful drug cartels as the Milenio Cartel and the CJNG. Hr'g Tr. 5/2/23 at 31; Hr'g Tr. 5/3/23 at 92, 135. The testimony of Nava Valencia, Mojarro Ramirez, and Guizar Valencia, as well as the Defendant's own BBM communications, also show that the Defendant exercised decision-making authority as a leader of Los Cuinis, was an active participant in planning and organizing cocaine shipments as part of an extensive distribution network, exercised control and authority over at minimum dozens of subordinates, and amassed substantial wealth from his cocaine-trafficking operation. *See* Dkt. No. 170 at 6–7 (summarizing testimony).

Although the Defendant did invest in some large cocaine shipments primarily organized by other drug traffickers, the Defendant need not have personally organized every cocaine shipment in which he invested to be a leader or organizer under Section 3B1.1(a).

12

### III. Conditions of Extradition

Finally, contrary to the Defendant's assertion, the Court is not required to impose a sentence below the Guideline sentence of life imprisonment. Any "condition" on the Defendant's sentence imposed by the Uruguayan court was unilateral or one-sided, and therefore it does not bind the United States.

"Ordinarily, the protocol for requesting and approving conditions on extradition is quite formal: the foreign country formally requests the agreement of the United States, generally through diplomatic channels, and the United States affirmatively conveys its agreement, generally through diplomatic channels." *United States v. Cuevas*, 402 F. Supp. 2d 504, 507 (S.D.N.Y. 2005), *aff'd in part, remanded in part,* 496 F.3d 256 (2d Cir. 2007). Where, as here, the united States did not give any diplomatic assurance regarding non-imposition of a life sentence and the extradition treaty does not impose such a requirement, the "unilateral belief" by the extraditing country that the United States would not seek a particular sentence "is insufficient to bind the United States." *Cuevas*, 496 F.3d at 263; *see also Rodriguez Benitez v. Garcia*, 495 F.3d 640, 644 (9th Cir. 2007) (affirming District Court finding that Venezuelan extradition decree attempting to unilaterally limit defendant's sentence in United States was unenforceable); *United States v. Banks*, 464 F.3d 184, 191–92 (2d Cir. 2006) (finding that, in absence of any agreement with United States limiting defendant's sentence, Dominican Republic's unilateral expectation that sentence would be limited to maximum under Dominican law would not bind United States); *United States v. Lopez-Aguilar*, No. CR 09-2962 WJ, 2015 WL 13662853, at *4 (D.N.M. July 9, 2015) (finding that, where United States gave no assurance as to life sentence, "hopes" expressed in order granting extradition from El Salvador "that the United States would

honor its wishes concerning certain sentencing limitation . . . does not bind the United States to those expressions.").

It is undisputed that the United States provided no diplomatic assurances regarding a life sentence as part of the Defendant's extradition arrangement. When Uruguay requested an assurance that a life sentence would not be imposed, the United States responded via diplomatic note that the extradition treaty between the United States and Uruguay "does not provide a basis for conditioning extradition on the provision of the assurance requested," and therefore "the United States is under no obligation to provide such an assurance." Dkt. No. 179 at Ex. X. Even absent an assurance, Uruguay relinquished custody of the Defendant and extradited him to the United States to face the charges in this case. Thus, the unilateral "condition" expressed in the Uruguayan court order regarding a life sentence is unenforceable.

Notably, nearly all exhibits to the Defendant's Post-Hearing Response Brief that purport to impose a condition on the Defendant's sentence predate Uruguay's request for an assurance and the United States' response. *See* Dkt. No. 179 at Exs. S–X. The only exception is the Uruguayan Attorney General's Office's motion to proceed with the extradition after receiving the United States' diplomatic note. *See id.* at Ex. Y. In that motion, the Uruguayan Attorney General's Office acknowledged the lack of an assurance by the United States and stated, "The failure to provide guarantees with respect to the non-imposition of the sentence of life imprisonment is justified, since it is understood that the petitioning State has alleged a valid legal argument to be exempted from such obligation, covered by the rules of the Treaty applicable between the parties." *Id.* at Ex. Y, p.12. With full knowledge that the United States refused to provide an assurance as to the non-imposition of a life sentence, and therefore explicitly did not foreclose asking for such a sentence, Uruguay nevertheless extradited the Defendant to the

United States.  Consequently, any unilateral condition imposed by Uruguayan courts on the Defendant's sentence is non-binding and unenforceable.

## IV.   Conclusion

For the reasons set forth above and in the Government's Supplemental Sentencing Memorandum, the Government respectfully requests that the Court impose a Guideline sentence of life imprisonment which is reasonable, appropriate, and matches the severity of the crime committed by the Defendant.  A life sentence is sufficient, but not greater than necessary, to hold the Defendant accountable for his crimes, promote respect for the law, deter the Defendant and others from committing similar serious crimes and protect the public.

Respectfully Submitted,
MARLON COBAR
Acting Chief, Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:   */s/ Kaitlin Sahni*
Kaitlin Sahni
Assistant Deputy Chief
Kate Naseef
Kirk Handrich
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division, U.S. Department of Justice
Washington, D.C.  20530
Telephone: (202) 514-0917

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing (ECF) system with the United States District Court for the District of Columbia to counsel of record for the Defendant, this 12th day of July, 2023.

By: /s/ *Kaitlin Sahni*
Kaitlin Sahni
Assistant Deputy Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice